# 22-3007-cv

# United States Court of Appeals
## for the Second Circuit

BUSINESS CASUAL HOLDINGS, LLC, a Delaware limited liability company,

*Plaintiff-Appellant*,

v.

YOUTUBE, LLC., a Delaware limited liability company, GOOGLE LLC, a Delaware limited liability company, ALPHABET INC., a Delaware corporation,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF APPELLANT AND SPECIAL APPENDIX

Ronald D. Coleman
DHILLON LAW GROUP, INC.
A California Professional Corporation
50 Park Place, Suite 1105
Newark, NJ 07102
(973) 498-1723
rcoleman@dhillonlaw.com
*Counsel for Appellant*
*Business Casual Holdings, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Appellant certifies that Business Casual Holdings, LLC has no parent corporation and that no publicly held corporation owns ten percent or more of Business Casual Holdings, LLC's corporate stock.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ivii

I.     PRELIMINARY STATEMENT ...................................................1

II.    JURISDICTIONAL STATEMENT .................................................3

III.   STATEMENT OF THE ISSUES FOR REVIEW ...........................3

IV.    STATEMENT OF THE CASE .....................................................4

   A.   Nature of the Case and Procedural History ...............................4

   B.   YouTube's Willful Blindness to RT-Novosti's Repeat Infringements.......10

   C.   The "Suspension" of RT's Channels ..........................................12

V.     SUMMARY OF THE ARGUMENT .............................................12

VI.    ARGUMENT ..............................................................................13

   1)   Standard of Review .....................................................................13

   2)   The Allegations and the Record Establish a Plausible Prima Facie Claim that YouTube Acted in Concert with TV-Novosti to Enable and Profit from Infringement of BC's Copyright-Protected Works. .............................................13

   3)   YouTube's Repeat Infringer Policy is Unreasonably Implemented Because Known Repeat infringement Does not Result in Termination. ...........................17

   4)   YouTube's Repeat Infringer Policy is Unreasonably Implemented Because of YouTube's "adjudication" requirement. .........................................19

   5)   The YouTube License Does not Exempt YouTube from All Liability for Infringement. ..............................................................................22

CONCLUSION ..................................................................................24

CERTIFICATE OF COMPLIANCE ....................................................25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60
  (2d Cir. 2012).............................................................................13

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2nd Cir. 2012).............13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................13

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293
  (4th Cir. 2018)...................................................................... 18, 21

*Capitol Recs., LLC v. Escape Media Grp., Inc.*, No. 12CV06646AJNSN,
  2014 WL 12698683 (S.D.N.Y. May 28, 2014), *report and recommendation*
  *adopted*, No. 12-CV-6646 AJN, 2015 WL 1402049 (S.D.N.Y.
  Mar. 25, 2015)...................................................................... 17, 22

*Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597 (9th Cir. 2018) ...........................17

*CrOSPin v. Christian Audigier, Inc.*, No. CV099509ABCJEMX, 2010 WL
  11508342 (C.D. Cal. June 21, 2010)....................................................23

*Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007)...............................................23

*Metro-Goldwyn Mayer Studios Inc. v. Grokster*, 545 U.S. 913, 930 (2005) ..........14

*Roberts v. BroadwayHD LLC*, No. 19 CIV. 9200 (KPF),
  2022 WL 976872, at *13 (S.D.N.Y. Mar. 31, 2022) ...........................................14

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ...........................14

**Statutes**

17 U.S.C. § 512 ("DMCA").............................................................*Passim*

28 U.S.C. § 1291 ........................................................................3

**Other Authorities**

H.R. Rep. No. 105-551, pt. 2, at 61 (1998); S. Rep. No. 105-190, at 52 (1998).....21

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................3, 13

Fed. R. Civ. Proc. 15 (a)(2)............................................................3

**Treatises**

3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.04[A][3][a] (2010) ....... 23

## I.     PRELIMINARY STATEMENT

This appeal asks whether, in interpreting 17 U.S.C. § 512, known as the Digital Millennium Copyright Act ("DMCA"), courts should defer to the self-interested definition provided by an online service provider ("OSP") of the term "appropriate circumstances" for termination of a repeat copyright infringer to qualify for the "safe harbor" from secondary liability.

The proposed First Amended Complaint ("FAC") in this action alleged, in detailed and well-documented fashion, that Defendants, who operate YouTube.com, colluded with a systematic repeat infringer on its platform by refusing to terminate that infringer's account. The repeat infringer, as alleged, is an important source of revenue for YouTube, and the allegations demonstrate multiple instances in which YouTube essentially acted, not as a neutral platform or intermediary, but as an open advocate for the infringer.  The district court, however, denied Plaintiff's motion to file the FAC, finding that it did not include plausible allegations of collusion as would justify allowing Plaintiff to proceed against YouTube as a secondary copyright infringer.

In doing so, the district court not only entirely disregarded plausible factual allegations in the FAC, which constitutes reversible error. It also erred by rejecting Plaintiff's argument that its plausible allegations of collusion by the OSP make out a failure to "adopt[] and reasonably implement[] . . . a policy that provides for the

termination in appropriate circumstances" of the repeat infringer's account with that OSP. The court repeatedly characterized plaintiff's claims as amounting to a theory that an OSP's failure to meet these requirements itself gives rise to a cause of action by an aggrieved copyright owner such as Plaintiff against the OSP.

In fact, however, that has never been Plaintiff's argument. Rather, Plaintiff's position is that these alleged facts, if true, would vitiate the Defendants' safe harbor protection, which is the essential legal ground on which Plaintiff's secondary copyright claim was dismissed. Absent the safe harbor defense, the FAC clearly and plausibly alleges that YouTube is a party with the legal right and practical ability to control the infringing activity—infringements that have been adjudicated as against the infringer in a separate action; that YouTube received and received a direct financial benefit from the infringement, and that YouTube has refused to terminate the repeat infringer in question.

By denying Plaintiff the opportunity to litigate its claims for secondary copyright infringement, the district court nullified Congress's intent that an OSP benefit from the DMCA safe harbor only on condition that it "reasonably implement" a policy that provides for a repeat infringer's termination in "appropriate circumstances." Under the law in this Circuit, it was was error for the district court to ignore Congress by deferring to what a defendant OSP deems "reasonable" and "appropriate" for purposes of protecting its own commercial interests, and refusing

to assess independently whether factual allegations raise bona fide factual-legal questions of whether that OSP has done what the DMCA requires: to **reasonably implement** a policy of terminating repeat infringers under the **appropriate circumstances**.

## II.    JURISDICTIONAL STATEMENT

Plaintiff-Appellant Business Casual Holdings, LLC ("BC") brought this action seeking damages and injunctive relief for claims of direct, contributory, and vicarious copyright infringement. against YouTube, LLC, Google LLC ("Google"), and Alphabet, Inc. ("Alphabet") (collectively, "YouTube") on March 21, 2022. YouTube moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), which the Court granted without prejudice on March 21, 2022. Business Casual timely moved pursuant to Fed. R. Civ. Proc. 15 (a)(2) for leave to file a proposed amended complaint, which the district court denied on November 22, 2022. BC timely filed its notice of appeal on November 23, 2022. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## III.    STATEMENT OF THE ISSUES FOR REVIEW

1.    Did the district court commit error by finding, as a matter of law on a motion to amend the complaint and applying the standard for a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), that the proposed FAC failed to state a claim for secondary copyright infringement due to the safe harbor provisions of the

DMCA despite the FAC's allegations showing that the Defendant had actual knowledge of a specific third party's repeated infringements of Plaintiff's copyrights yet the Defendant refused to terminate that infringer's account, thus stating a plausible prima facie claim that Defendant's repeat infringer policy was not reasonably implemented?

2.      Did the district court commit error by finding, as a matter of law on a motion to amend the complaint and applying the standard for a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), that the proposed FAC failed to state a claim for secondary copyright infringement due to the safe harbor provisions of the DMCA despite the FAC's allegations showing that the Defendant had actual knowledge that a specific third party had avoided termination because of its repeated infringements of Plaintiff's copyrights by filing what its own counsel admitted were meritless counter-notifications, thus stating a plausible prima facie claim that Defendant's repeat infringer policy was not reasonably implemented?

## IV.   STATEMENT OF THE CASE

### A.   <u>Nature of the Case and Procedural History</u>

As set forth in the November 22, 2023 Memorandum and Opinion of the district court [A-383], the Plaintiff alleges that YouTube operates an online user-generated content-hosting platform on which its users may upload, view, and share video content. YouTube, LLC is a wholly owned subsidiary of Google, and Google

is a wholly owned subsidiary of Alphabet. Business Casual creates documentary content that it posts on its YouTube channel. On June 8, 2018, Business Casual published on YouTube an original documentary video titled, "How Rockefeller Built His Trillion Dollar Oil Empire" (the "Rockefeller Video"). On January 25, 2020, Business Casual posted on YouTube another original documentary video, titled "J.P. Morgan Documentary: How One Man Financed America" (the "J.P. Morgan Video"). Business Casual obtained federal copyright registrations for both the Rockefeller Video and the J.P. Morgan Video on March 8, 2021.

YouTube's terms of service provide in pertinent part that users who upload video content to YouTube grant "to YouTube a worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use that [c]ontent (including to reproduce, distribute, prepare derivative works, display and perform it)" (the "License"). These provisions, however, at best apply to You Tube, and to third parties. Thus, YouTube also has rules and policies related to the posting and maintenance of copyrighted content on its platform. Under one such policy (the "Repeat Infringer Policy"), YouTube will remove a video if a copyright owner lodges a complaint with YouTube in accordance with the DMCA alleging that the video infringes the owner's copyright. If a valid DMCA complaint is filed and a video is removed from the platform, YouTube will give the user against whom the complaint is lodged a so-called "copyright strike." If a user receives three copyright

5

strikes within a 90-day period, "their account, along with any associated channels, will be terminated."

YouTube provides its more valuable customers, which are those that participate in its "Partner Program," an additional week-long courtesy period during which the user's channel will remain on the platform if that user receives three copyright strikes in a 90-day period. If, within that timeframe, that user submits a "counter-notification" to YouTube contesting the DMCA complaint, the user's channel will not be disabled until the complaint and the counter-notification are "adjudicated," i.e., judicially resolved.

Both the Original Complaint and the proposed FAC alleged that YouTube failed to apply its Repeat Infringer Policy in a reasonable manner to non-party TV-Novosti, which allegedly operates 39 YouTube channels on behalf of the Russian government. One of those channels is known as "RT Arabic."

On January 2, 2021, Business Casual submitted a DMCA takedown notice to YouTube concerning a video posted on the RT Arabic channel that copied certain scenes from the J.P. Morgan Video (the "First RT Video") . On January 11, 2021, "nine days after [Business Casual] filed its DMCA takedown notice," YouTube removed the First RT Video and "applied a copyright strike to TV-Novosti's RT Arabic YouTube channel." TV-Novosti filed a counter-notification regarding the

First RT Video on January 19, 2021, but then conceded in writing that the counter-notification was a "mistake" and withdrew it the following day.

On February 9, 2021, Business Casual submitted a second DMCA takedown notice to YouTube concerning another video posted on the RT Arabic channel, which allegedly copied one copyrighted scene from the Rockefeller Video (the "Second RT Video"). On February 15, 2021, Business Casual submitted a third DMCA takedown notice to YouTube regarding a video livestreamed on the RT Arabic channel (the "Third RT Video") for its copying of the same scenes from the J.P. Morgan Video that had appeared in the First RT Video. YouTube removed the Third RT Video on February 18, 2021, and applied a second copyright strike to the RT Arabic channel.

On February 28, 2021, YouTube notified Business Casual that TV-Novosti had filed a DMCA counter-notification with respect to the Third RT Video and that YouTube would reinstate the video if the plaintiff did not seek a court order regarding TV-Novosti's alleged copyright infringement within ten days. BC timely filed a copyright-infringement action against TV-Novosti in the Southern District of New York styled *Business Casual Holdings, LLC v. TV-Novosti*, Docket No. 21-cv-2007 (the "TV-Novosti Action").

On March 4, 2021, YouTube removed TV-Novosti's Second RT Video and applied a third copyright strike to the RT Arabic channel. In the period between

YouTube's receipt of the second takedown notice and its removal of the Second RT Video, there was correspondence between YouTube and BC concerning the merits of BC's copyright claim arising from "concern" on the part of YouTube regarding fair use, and despite the fact that, as alleged in ¶ 151 of the FAC, YouTube's terms of service state that it "isn't able to act as a mediator" in copyright disputes between creators and that "it's up to the parties involved to resolve the issue in court." [A-312-318]

On March 31, 2021, YouTube, as the district court put it, "briefly terminated the RT Arabic channel," but reinstated the channel several hours later. Correspondence among BC, YouTube and RT continued for several months, and included a May 19, 2021 email from Google Moscow's Head of Enterprise Partnerships, Elisabet Lykhina, to BC asked if Plaintiff would be open "to discuss[ing]"—with YouTube—BC's three takedown notices against TV-Novosti, which Lykhina said would "bring new insights" to BC's claims. (¶¶147, 152-153). "Your answer," YouTube's Lykhina wrote, "will be strongly appreciated." (*Id*.)

Thus, as alleged in the FAC [A-273] and supported by an ample documentary record incorporated into the pleadings:

- TV-Novosti infringed multiple BC copyrights. (¶¶ 2, 71-99)

- TV-Novosti is a repeat infringer with three copyright "strikes," which if unchallenged would result in termination by YouTube, arising from BC infringements. (¶¶ 13, 102, 111.)

- YouTube's policy is that, regardless of the information available to it regarding repeat infringement, a repeat infringer may avoid termination merely by filing a DMCA counter-notification—even if that counter-notification, on its face, contains false information and has been filed in bad faith defendant on its face—unless and until three infringements are "adjudicated" within 90 days of one another. (¶¶ 13, 19, 71-75.)

- TV-Novosti knowingly filed materially false DMCA counter-notifications for the admitted purpose of avoiding "termination" of its accounts. (¶ 149.)

- Emails exchanged between RT and YouTube resulted in YouTube's actual / red-flag knowledge of the all the foregoing facts. (¶¶ 13, 15, 110-117, 124-140.)

- Both prior to and during the litigation, YouTube has acted as an advocate for RT.

- YouTube refuses to terminate TV-Novosti's accounts and has strong economic incentives to collude with TV-Novosti. (¶¶ 139-154.)

## B.    YouTube's Willful Blindness to RT-Novosti's Repeat Infringements

Plaintiff's claims against YouTube never depended on whether or not YouTube actively and diligently polices allegedly infringing activity on its platform or whether YouTube employs anti-infringement technology.  What the FAC alleges, rather, is that despite having and using such systems, YouTube acquired actual knowledge of RT's circumvention of them to infringe BC's copyrights (¶¶ 13, 15, 110-117, 124-140, 176) but refused terminate RT's accounts or disgorge revenues it collected as a result of RT's infringement, claiming that despite having that knowledge, YouTube just could not say if RT was a repeat infringer.

But there has never been a serious dispute that RT's repeated infringements of Business Casual's copyrights, which are valid (¶¶ 39-51, 87-88), are obvious upon a brief and casual viewing: (¶¶ 2, 6).  Indeed, the TV-Novosti Action ultimately resulted in the "adjudication" required by YouTube in the form of a default judgment against TV-Novosti for copyright infringement, entered by the district court on October 7, 2022 (Dkt. 69 in that action).[1]

---

[1] On February 8, 2023, U.S. Magistrate Judge Robert W. Lehrburger filed a Report and Recommendation in the TV-Novosti Action (Dkt. 80 in that matter) recommending that the Court enter judgment in favor of Plaintiff against TV-Novosti awarding Plaintiff: (1) $75,000 in statutory damages pursuant to the DMCA; (2) attorney's fees in the amount of $134,785.64; (3) pre-

Unlike typical cases involving secondary infringement, Plaintiff's allegations of willful blindness, and the premise of its claims against YouTube for secondary copyright liability, do not arise from a failure by YouTube to detect, prevent or acknowledge the infringement. Rather, Plaintiff argued below that YouTube made itself "blind" is by refusing to acknowledge plainly objective facts of repeat infringement by RT, which it justifies by reference to the "adjudication" provision of its own repeat-infringer policy. This policy which makes no accommodation for any degree, kind or quantity of empirical proof of deliberate, systematic repeat infringement.

The proposed FAC alleged that YouTube persisted in its refusal to terminate RT for repeat infringement even after it became aware of an email from from TV-Novosti's counsel to Plaintiff's prior counsel **conceding** that the real reason RT would not retract its strike disputes is its recognition that "withdrawing the counter-notifications will result in YouTube terminating RT's channel[s]":(¶¶ 4, 110.) YouTube thus had actual knowledge of an admission by RT that it had no bona fide basis for its counter-notification—the only thing holding off termination under

---

judgment and post-judgment interest at the federal rate for post-judgment interest; and (4) the opportunity to take third-party damages discovery and to seek leave to amend the judgment based on competent proof of actual damages for copyright infringement within six months of entry of judgment.

YouTube's own policies—as well as 223 pages of emails between its representatives and Plaintiff, as set forth in the proposed FAC. (¶¶ 5, 23, 113.)

### C.    The "Suspension" of RT's Channels

YouTube turned a blind eye to its awareness of RT's admittedly false counter-notifications from March 31, 2021 through March 11, 2022, a 346-day period during which YouTube knowingly enabled RT to successfully skirt termination. It was only ror reasons unrelated to this lawsuit—that is, the invasion of Ukraine by Russia, the owner of RT—that ultimately caused RT's videos, across all its channels (i.e., not only RT-Arabic) to be temporarily "blocked worldwide." This is not, however, account **termination**, which is permanent; which takes and remains in effect without reference to world or political events; and which affects all channels owned by or "associated with" a user such as RT that is a repeat infringer.

## V.    SUMMARY OF THE ARGUMENT

The district court erred by deferring to YouTube's assertion that merely because it has a policy regarding repeat infringers, it is entitled to the DMCA's safe harbor and cannot, as a matter of law, be amenable to a claim for secondary copyright infringement. The court below failed to assess the pleadings to determine properly whether YouTube's conduct meets the requirement under the DMCA that an OSP not only adopt but "reasonably implement[] . . . a policy that provides for the termination in appropriate circumstances of" users who are determined to be "repeat

infringers" of copyrighted material. This error arose, in part, because the district court failed to accept all the pleaded allegations as true and by simply disregarding allegations that raised a plausible inference of collusion or coordination between Defendant and RT.

## VI.    ARGUMENT

### 1) <u>Standard of Review</u>

This Court reviews *de novo* a district court's order granting a motion to dismiss under   Fed. R. Civ. P. 12(b)(6).  *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 65 (2d Cir. 2012). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Plausibility is "a standard lower than probability." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2nd Cir. 2012). "[A] given set of actions may well be subject to diverging interpretations, each of which is plausible," and "[t]he choice between or among plausible inferences or scenarios is one for the factfinder." *Id*. at 184-85.

### 2) **The Allegations and the Record Establish a Plausible Prima Facie Claim that YouTube Acted in Concert with TV-Novosti to Enable <u>and Profit from Infringement of BC's Copyright-Protected Works.</u>**

A defendant is liable for contributory infringement when it intentionally induces or encourages direct infringement. *Metro-Goldwyn Mayer Studios Inc. v.*

*Grokster*, 545 U.S. 913, 930 (2005). As the Second Circuit wrote in *Viacom Int'l,*

*Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012):

> The principle that willful blindness is tantamount to knowledge is hardly novel. A person is "willfully blind" or engages in "conscious avoidance" amounting to knowledge where the person was aware of a high probability of the fact in dispute and consciously avoided confirming that fact. Writing in the trademark infringement context, we have held that a service provider is not permitted willful blindness. When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way.

*Id*. at 34–35 (internal quotes and citations omitted). The Court went on to hold that

"the willful blindness doctrine may be applied, in appropriate circumstances, to

demonstrate knowledge or awareness of specific instances of infringement under the

DMCA." *Id. See*, *Roberts v. BroadwayHD LLC*, No. 19 CIV. 9200 (KPF), 2022 WL

976872, at *13 (S.D.N.Y. Mar. 31, 2022) (construing allegations in the light most

favorable to plaintiff, claim that defendants found value in and benefited from third

party's alleged infringement sufficiently stated a claim for contributory

infringement).

The FAC alleges facts necessary to make out a prima facie claim for

contributory infringement, including by alleging specific examples of YouTube's

knowledge or awareness of specific instances of infringement. The district court,

however, determined that as a matter of law no claim had been stated by BC because BC had not alleged plausibly that YouTube "acted in concert" with TV-Novosti or participated in or contributed to the alleged infringement in any way. [A-400.] Based on those allegations, this was error, not least because the district court omitted any mention of the email, described and quoted in the proposed FAC, from Google Moscow's Head of Enterprise Partnerships Elisabet Lykhina to BC attempting to mediate BC's dispute—not its dispute between BC and YouTube, but between BC and the infringer, TV-Novosti.

Lykhina's email to BC. urging a conversation with her, as a representative of YouTube, "to discuss the current case of 3 [YouTube] strikes that your channel Business Casual has recently sent" concerning the infringements of BC's videos by TV-Novosti that would "bring new insights" to BC's claims, was more than an obvious demonstration of just how little YouTube's "policies" are actually, or effectively, implemented.  They raise a legitimate, plausible question of collusion that goes right to the heart of BC's secondary liability claims. The district court was wrong to have disregarded this communication in concluding that there was no plausible allegation of collusion or coordination between RT and YouTube.

The Lykhina email was the best example of a fact pleaded, and documented, that makes the district court's conclusion on coordination between the infringer and YouTube, the OSP, incomprehensible. As noted above, both before the filing of this

15

lawsuit and during the proceedings below, YouTube consistently asserted that its legal duty did not extend to determining whether an alleged infringement constitutes permitted use, but only to expeditiously removing content that is **claimed** to be infringing after receiving a takedown notice. Yet in multiple submissions and representations, YouTube was at pains in multiple submissions and representations in the district court to advance what it described as TV-Novosti's "very strong fair use defense." (¶ 122.)  YouTube's placement of a thumb on the scale obviously influenced the district court, which downplayed the significance of BC's infringement claims and even implied that there may have been merit to RT's infringement defenses.  These defenses, however, were never advanced by RT, which was not a party to the litigation, but by the supposed "mere instrumentality," YouTube, in defense of its refusal to terminate RT as a repeat infringer.

YouTube, in other words, at once—and with the district court's approval—took refuge behind its terms of service throughout its two motions against RT's pleadings, yet at the same time disregarded its own "not a mediator" policy to raise questions about the bona fides of BC's claims in defense of its own inaction against RT. The district court completely ignored this contradiction and the other indications that YouTube's interests were very much aligned with those of RT. Doing so, especially at the pleading stage, was error.

16

### 3) YouTube's Repeat Infringer Policy is Unreasonably Implemented Because Known Repeat infringement Does not Result in Termination.

Under the DMCA, an OSP must "adopt[] and reasonably implement[] . . . a policy that provides for the termination in appropriate circumstances of" users who are determined to be "repeat infringers" of copyrighted material. There is no dispute that an OSP's process of identifying and sanctioning repeat infringers does not need to work perfectly to satisfy this provision; it merely needs to be "reasonably implement[ed]." See, *Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597 (9th Cir. 2018). But "the plain meaning of the DMCA's language is that, in implementing a repeat infringer policy, the service provider **must**, when appropriate, terminate, or 'end,' a subscriber's subscription or an account holder's account." *Capitol Recs., LLC v. Escape Media Grp., Inc.*, No. 12CV06646AJNSN, 2014 WL 12698683, at *31 (S.D.N.Y. May 28, 2014), *report and recommendation adopted*, No. 12-CV-6646 AJN, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) (emphasis added).

A policy is not reasonable, moreover, if by its own terms it is not applied consistently. A policy that provides for two sets of rules, one of which is a virtual secret and provides YouTube's best customers with the greatest toleration for copyright infringement, is no "policy" at all. The DMCA makes no allowance for such favoritism, which cheats both smaller creators and copyright owners. Rather, it simply defines a "repeat infringer" as any user that "infringes a copyright **more than**

17

**once**." *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 301 (4th Cir. 2018) (emphasis added). There is no allowance in this formulation for what kind of user it is that infringes repeatedly. Indeed, in *Cox*, the defendant applied the same non-compliant policy (13 strikes every 6 months) to all its account holders.

YouTube cannot say the same here. Under YouTube's policy for creators such as BC and 40 million other channels, Plaintiff's account can receive up to **eight** uncontested copyright strikes every 12 months before facing termination. (¶ 58.) But YouTube's policy for TV-Novosti and other highly profitable "Content Owners" are considerably more forgiving. TV-Novosti's accounts can receive up to 35 uncontested copyright strikes, every 12 months, and **never face termination**. (¶ 65.)

In any event, under both policies, a willful, admitted and obvious repeat infringer **need never dispute its copyright strikes** at all: It can simply wait for them to expire before going on another infringing spree, repeating the same process indefinitely. A policy—much less a two-tiered policy—that does not provide for the termination of account holders who repeatedly infringe the copyrights of others cannot be said, as a matter of law, to be "reasonably implemented." And this is why it was error for the district court to dismiss BC's action at the pleading stage. Whether YouTube's practices ultimately result in the withdrawal of safe harbor protection should not rest with a judicial rubber stamp on a defendant's assurances that it knows what is doing and it is all for the best. Rather, that determination should

depend on how the facts elicited during discovery bear on the reasonableness of YouTube's policies.

The fact that Plaintiff takes issue with the district court's decision as amounting to a holding that Congress did not intend to allow courts to determine whether the implementations of an OSP's repeat infringement policies met the DMCA's reasonableness requirement does not imply what may seem like the mirror-image proposition: that a user's channel must be terminated any time someone **says** that user is a repeat infringer. Such an argument would be absurd, and Plaintiff itself has invested thousands of hours into building its own channel and would be devastated if its account were shut down because a bad actor filed fraudulent takedown notices against it. But the DMCA does explicitly require reasonableness, not capriciousness. Axiomatically, that means YouTube must apply its repeat infringer policy to all users equally, and, in rare cases such as this one—where the repeat infringement is obvious and admitted and the counter-notification is patently fraudulent—step in and terminate blatant repeat infringers.

### 4) YouTube's Repeat Infringer Policy is Unreasonably Implemented Because of YouTube's "adjudication" requirement.

By the same logic, the district court's approach—that YouTube has earned its right to invulnerability to secondary infringement claims merely by enunciating some policy or another, no matter how inconsistently implanted—also fails to

address YouTube's rule that, once a counter-notification is filed, it will take no further action absent final adjudication by a court.

In fact, such an approach is the exact opposite of what Congress intended when it enacted the DMCA in 1998. It was acutely aware that the termination of a repeat infringer's account would entail the removal of both infringing and non-infringing material, which the district court posits is a reason to be more, not less, solicitous of YouTube's tolerance of RT's admitted repeat infringements. In fact, it is because of the dramatic effect of repeat infringement on an abusive user's access to a platform, not in spite of it, that Congress chose the word **termination** to describe the sanction to be imposed **by the OSP**, because merely taking down (much less, as in this case, temporarily blocking access to) a pirate's infringing material until everything would be "all sorted out through the courts" would be like playing a game of whack-a-mole:

> The legislative history of the repeat infringer provision supports this conclusion. Both the House Commerce and Senate Judiciary Committee Reports explained that "**those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access**." H.R. Rep. No. 105-551, pt. 2, at 61 (1998); S. Rep. No. 105-190, at 52 (1998). This passage makes clear that if persons "abuse their access to the Internet through disrespect for the intellectual property rights of others"—that is, if they infringe copyrights—they should face a "realistic threat of losing"

> their Internet access. **multipl** Indeed, the risk of losing one's Internet access would hardly constitute a "realistic threat" capable of deterring infringement if that punishment applied only to those already subject to civil penalties and legal fees as adjudicated infringers.

*BMG Rts. Mgmt. (US) LLC*, 881 F.3d at 302 (emphasis added).

The district court endorsed YouTube's policy requiring that repeat infringements must be "adjudicated" by an Article III court before the accounts of those responsible are terminated. This was error: the DMCA mandates termination of repeat infringers in **appropriate circumstances**, i.e., when the facts establish to the OSP that a user is, again, simply "one who infringes a copyright more than once." *BMG Rts. Mgmt. (US) LLC.*, *supra*, 881 F.3d at 301.[2]

And, in fact, YouTube's own public-facing policy requires just that, explicitly requiring termination of all "associated" channels of the repeat infringer, as shown on YouTube's website.  As this Court explained in *Capitol Recs., LLC v. Escape Media Grp., Inc.*, *supra*, deeming a mere "upload-disabling policy to constitute 'termination' under § 512(i) would be unprecedented and antithetical to the principle of disassociation and revocation of access that has been expressed by Congress and many courts both in and outside of this district." 2014 WL 12698683 at *31. Yet that

---

[2]  "If a user gets three copyright strikes in 90 days, their account, **along with any associated channels**, will be **terminated**." (Emphasis added). (URL: https://www.youtube.com/howyoutubeworks/policies/copyright/#enforcing-copyright)

is exactly what the district court, notably through its repeated emphasis on the assertion that none of the infringing videos is accessible on YouTube at present, has endorsed. This was error.

### 5) The YouTube License Does not Exempt YouTube from All Liability for Infringement.

The district court placed great store on the License as carte blanche for YouTube to do whatever it wants to profit from Plaintiff's content. In addressing this issue, the court wrote as follows:

> The relevant question here is not whether YouTube was entitled to authorize TV-Novosti's use of Business Casual's copyrighted video content. Rather, the question is whether YouTube's use of the plaintiff's content – here, the display of copyrighted video segments that Business Casual had previously uploaded to YouTube – fell within YouTube's broad rights as the licensee of the plaintiff's YouTube videos. As discussed above, the License does cover that use.

[A-398] The only "display of copyrighted video segments that Business Casual had previously uploaded to YouTube" alleged in the FAC was by TV-Novosti, however. And "[a]n unauthorized licensor may be liable for infringement committed by his unauthorized licensees under a theory of contributory infringement as 'one who with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct.'" *Davis v. Blige*, 505 F.3d 90, 105 n.13 (2d Cir. 2007). Thus "under appropriate circumstances, a licensor will be liable as a contributory infringer

where his licensee pursuant to such license infringes a copyright of a third party by making unauthorized copies or unauthorized performances." 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.04[A][3][a] (2010), *quoted in CrOSPin v. Christian Audigier, Inc.*, No. CV099509ABCJEMX, 2010 WL 11508342, at *5 (C.D. Cal. June 21, 2010). *See*, *Seals v. Compendia Media Grp.*, 290 F. Supp. 2d 947, 953 (N.D. Ill. 2003) (licensees profited unlawfully from unlicensed third party's infringements). The FAC alleges facts plausibly showing at least collusion between Defendant and TV-Novosti meet the low threshold to state a claim for contributory copyright infringement and—depending on the extent of cooperation between YouTube and TV-Novosti that may be revealed in discovery—possibly direct infringement.

The district court's reliance on the License, therefore, as the basis for dismissal of any of BC's claims at the pleadings stage was error.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that this Court should reverse the district court's order of November 22, 2023 dismissing plaintiff's action with prejudice and remand the matter to the district court for further proceedings based on the claims in the First Amended Complaint.

DHILLON LAW GROUP, INC.
A California Professional Corporation

By: _____
    Ronald D. Coleman
50 Park Place, Suite 1105
Newark, NJ 07102
(973) 498-1723
rcoleman@dhillonlaw.com
*Attorneys for Plaintiff-Appellant*
*Business Casual Holdings, LLC*

Dated: February 9, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 5,243 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

By: _____

Ronald D. Coleman

Dated: February 9, 2023

25

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify pursuant to Fed. R. App. P. 25(d) that on February 9, 2023 I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system, and thereby caused the foregoing Brief to be served upon all counsel of record by electronic mail generated by the Court's CM/ECF system in accordance with Local Rule 25.1(h).

I further certify that, in accordance with Local Rule 31.1, I shall cause six paper copies of the foregoing Brief to be filed promptly with the Court.

By: _____
Ronald D. Coleman

Dated: February 9, 2023

# SPECIAL APPENDIX

# TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order Denying
  Plaintiff's Motion to File an
  Amended Complaint, dated November
  22, 2022, Appealed from …..………………..   SPA-1


Clerk's Judgment, dated November 23,
  2022, Appealed from …………………………… SPA-25


17 U.S.C. § 512 Limitations of liability relating
  to material online …………………………….. SPA-26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————

BUSINESS CASUAL HOLDINGS, LLC,

                    Plaintiff,               21-cv-3610 (JGK)

        – against –                          MEMORANDUM OPINION
                                             AND ORDER
YOUTUBE, LLC, ET AL.,

                    Defendants.
——————————————————————————

JOHN G. KOELTL, District Judge:

     The plaintiff, Business Casual Holdings, LLC ("Business
Casual"), brought this action against YouTube, LLC, Google LLC
("Google"), and Alphabet, Inc. ("Alphabet") (collectively,
"YouTube"), seeking damages and injunctive relief for claims of
direct, contributory, and vicarious copyright infringement. See
Complaint, ECF No. 1 ("Original Complaint"). In a Memorandum
Opinion and Order dated March 21, 2022, this Court granted
YouTube's motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6) and dismissed the Original Complaint without
prejudice. See Bus. Casual Holdings, LLC v. Youtube, LLC, No.
21-cv-3610, 2022 WL 837596 (S.D.N.Y. Mar. 21, 2022) (the "First
Opinion"). Business Casual now moves pursuant to Federal Rule of
Civil Procedure 15(a)(2) for leave to file a proposed amended
complaint. See ECF No. 56-1 ("Amended Complaint"). For the
reasons below, Business Casual's motion for leave to amend is
**denied.**

SPA-02

## I.

## A.

The Amended Complaint repeats the bulk of the allegations from the Original Complaint, which is described at length in the First Opinion. See 2022 WL 837596, at *1-2. Familiarity with the First Opinion is assumed. Unless otherwise noted, the following allegations are taken from the Original and Amended Complaints. Where necessary, the summary below indicates which allegations are new additions contained only in the Amended Complaint.[1]

YouTube operates an online user-generated content-hosting platform on which its users may upload, view, and share video content. See First Opinion, 2022 WL 837596, at *1. YouTube, LLC is a wholly owned subsidiary of Google, and Google is a wholly owned subsidiary of Alphabet. Compl. ¶¶ 15-17; Am. Compl. ¶¶ 26-29. Business Casual creates documentary content that it posts on its YouTube channel. Compl. ¶ 14.

On June 8, 2018, Business Casual published on YouTube an original documentary video titled, "How Rockefeller Built His Trillion Dollar Oil Empire" (the "Rockefeller Video"). Compl. ¶ 22; Am. Compl. ¶ 76. On January 25, 2020, Business Casual posted on YouTube another original documentary video, titled

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

## SPA-03

"J.P. Morgan Documentary: How One Man Financed America" (the

"J.P. Morgan Video"). Compl. ¶ 23; Am. Compl. ¶ 77. The Amended

Complaint explains that these videos, like many of Business

Casual's videos, feature unique three-dimensional renderings of

historical scenes that have been created using Business Casual's

specialized "parallax" technology. See Am. Compl. ¶¶ 36, 39-53.

Business Casual obtained federal copyright registrations for

both the Rockefeller Video and the J.P. Morgan Video on March 8,

2021. Compl. ¶¶ 24-25; Am. Compl. ¶¶ 78-79.

As discussed in the First Opinion, YouTube's terms of

service provide in pertinent part that users who upload video

content to YouTube grant "to YouTube a worldwide, non-exclusive,

royalty-free, sublicensable and transferable license to use that

[c]ontent (including to reproduce, distribute, prepare derivative

works, display and perform it)" (the "License"). ECF No. 30-3 at

10; see also id. at 5 ("Your use of the [YouTube service] is

subject to these terms . . . .").[2] YouTube also has rules and

---

[2] For the reasons discussed in the First Opinion, the Court may
consider YouTube's terms of service, which include the License,
even though the terms of service were not reproduced in or
attached to either the Original Complaint or the Amended
Complaint. See First Opinion, 2022 WL 837596, at *1 n.2. As
before, Business Casual does not dispute that the terms of
service are authentic and publicly available on the internet,
and therefore subject to judicial notice. In any event,
YouTube's terms of service are properly considered at this stage
because they are integral to and are expressly referenced in the
Complaint and the Amended Complaint. See, e.g., Am. Compl. ¶ 57;
Compl. ¶ 6; Compl. Exs. A, E, F, ECF Nos. 1-1, 1-5, 1-6.

3

Case 1:21-cv-03610-JGK Document 64 Filed 11/22/22 Page 4 of 24
Case 22-3004, Document 94, 01/06/2023, 3440831, Page39 of 94

SPA-04

policies related to the posting and maintenance of copyrighted
content on its platform. See generally ECF No. 1-1. Under one
such policy (the "Repeat Infringer Policy"), YouTube will remove
a video if a copyright owner lodges a complaint with YouTube in
accordance with the Digital Millennium Copyright Act ("DMCA"),
alleging that the video infringes the owner's copyright. Compl.
¶ 45; Am. Compl. ¶ 55. If a valid DMCA complaint is filed and a
video is removed from the platform, YouTube will give the user
against whom the complaint is lodged a so-called "copyright
strike." Compl. ¶ 45; Am. Compl. ¶ 55. If a user receives three
copyright strikes within a 90-day period, "their account, along
with any associated channels, will be terminated." Compl. ¶ 45;
Am. Compl. ¶ 55. However, when a user in YouTube's "Partner
Program" receives three copyright strikes in a 90-day period,
YouTube affords the user an additional week-long courtesy period
during which the user's channel will remain on the platform.
Compl. ¶ 46; Am. Compl. ¶ 56. If, within that timeframe, the
user submits a "counter-notification" to YouTube contesting the
DMCA complaint, the user's channel will not be disabled until
the complaint and the counter-notification are resolved. Compl.
¶ 46; Am. Compl. ¶ 56.

------

4

SPA-05

In both the Original Complaint and the Amended Complaint,
the plaintiff contends that YouTube failed to apply its Repeat
Infringer Policy in a reasonable manner to non-party TV-Novosti,
which allegedly operates 39 YouTube channels on behalf of the
Russian government. Compl. ¶¶ 50-51, 53. One of those channels
is known as "RT Arabic." Id. ¶ 53; Am. Compl. ¶ 85. On January
2, 2021, Business Casual submitted a DMCA takedown notice to
YouTube concerning a video posted on the RT Arabic channel that
allegedly copied certain scenes from the J.P. Morgan Video (the
"First RT Video"). Compl. ¶ 27; Am. Compl. ¶ 83. On January 11,
2021, "nine days after [Business Casual] filed its DMCA takedown
notice," YouTube removed the First RT Video and "applied a
copyright strike to TV-Novosti's RT Arabic YouTube channel."
Am. Compl. ¶ 85; see Compl. ¶ 28. The Amended Complaint alleges
that TV-Novosti filed a counter-notification regarding the First
RT Video on January 19, 2021, but then conceded that the
counter-notification was a "mistake" and withdrew it the
following day. See Am. Compl. ¶¶ 88-89.

On February 9, 2021, Business Casual submitted a second
DMCA takedown notice to YouTube concerning another video posted
on the RT Arabic channel, which allegedly copied one copyrighted
scene from the Rockefeller Video (the "Second RT Video"). Compl.
¶ 32; Am. Compl. ¶ 92. On February 15, 2021, Business Casual
submitted a third DMCA takedown notice to YouTube regarding a

5

video livestreamed on the RT Arabic channel (the "Third RT
Video"), which allegedly copied the same scenes from the J.P.
Morgan Video that had appeared in the First RT Video. Compl.
¶¶ 33-34; Am. Compl. ¶¶ 94-95. YouTube removed the Third RT
Video on February 18, 2021, and applied a second copyright
strike to the RT Arabic channel. Compl. ¶ 35; Am. Compl. ¶ 96.

On February 28, 2021, YouTube notified Business Casual that
TV-Novosti had filed a DMCA counter-notification with respect to
the Third RT Video and that YouTube would reinstate the video if
the plaintiff did not seek a court order regarding TV-Novosti's
alleged copyright infringement within ten days. Compl. ¶ 37; Am.
Compl. ¶ 98. The plaintiff timely filed a copyright-infringement
action against TV-Novosti in this Court. Am. Compl. ¶ 104; see
Bus. Casual Holdings, LLC v. TV-Novosti, No. 21-cv-2007
(S.D.N.Y. filed Mar. 9, 2021) (the "TV-Novosti Action").

On March 4, 2021, YouTube removed TV-Novosti's Second RT
Video and applied a third copyright strike to the RT Arabic
channel. Compl. ¶ 38; Am. Compl. ¶ 102. The Amended Complaint
alleges that in the period between YouTube's receipt of the
second takedown notice and its removal of the Second RT Video,
YouTube requested and Business Casual provided certain details
pertaining to YouTube's concern that the Second RT Video might
qualify as "fair use." See Am. Compl. ¶¶ 118-119, 123-125. On
March 12, 2021, YouTube notified Business Casual that TV-Novosti

6

had filed a counter-notification with respect to the Second RT
Video. Compl. ¶ 40; Am. Compl. ¶ 105. Business Casual amended
its complaint in the TV-Novosti Action accordingly. See Compl.
¶ 41; Am. Compl. ¶ 106.

In sum, as alleged in both the Original Complaint and the
Amended Complaint, YouTube removed the First RT Video nine days
after it received Business Casual's complaint; the Second RT
Video twenty-three days after it received Business Casual's
complaint; and the Third RT Video three days after it received
Business Casual's complaint. With regard to all three videos,
the Original Complaint and the Amended Complaint allege that TV-
Novosti had altered watermarks and colors in the infringed
images so that the videos would "evade detection from YouTube's
copyright-detection technology." Am. Compl. ¶¶ 107-108; see,
e.g., id. ¶ 125 (paraphrasing an email in which the plaintiff
explained to YouTube that TV-Novosti's alterations "mak[e] it
impossible for YouTube's Content Matching Tool to detect [the
plaintiff's] original content on [TV-Novosti's] channel"); see
also Compl. ¶ 44 (alleging that TV-Novosti manipulated colors
and replaced watermarks to "circumvent YouTube's automated . . .
Copyright Match Tool" in order "to avoid getting caught doing
what it knew was unlawful").

On March 31, 2021, YouTube briefly terminated the RT Arabic
channel, but reinstated the channel several hours later. Compl.

¶ 48; Am. Compl. ¶¶ 156, 163. As of the filing of the proposed Amended Complaint, the First, Second, and Third RT Videos were still inaccessible on YouTube, see Am. Compl. ¶ 103, though RT Arabic and TV-Novosti's other YouTube channels remained on the platform, see, e.g., id. ¶ 22; Compl. ¶¶ 47-49. Between January and April 2021, Business Casual exchanged correspondence with several YouTube representatives and "senior" Google executives regarding its allegations of copyright infringement against TV-Novosti. See, e.g., Compl. ¶¶ 59, 69-73; Am. Compl. ¶¶ 113, 114-119, 123-129, 132-138, 146-147. As indicated in the Amended Complaint, Business Casual's communications with YouTube repeatedly expressed Business Casual's position that TV-Novosti's channels should be terminated under YouTube's Repeat Infringer Policy. See, e.g., Am. Compl. ¶¶ 129, 133, 137.

### B.

Business Casual filed its Original Complaint against YouTube on April 22, 2021, alleging that YouTube (1) directly infringed Business Casual's copyrights, (2) contributed to TV-Novosti's copyright infringement, and (3) is vicariously liable for TV-Novosti's copyright infringement. See Compl. ¶¶ 75-98, 99-101, 102-104. On August 18, 2021, YouTube moved to dismiss all of Business Casual's claims pursuant to Rule 12(b)(6). See ECF No. 28.

SPA-09

In the First Opinion, this Court granted YouTube's motion
to dismiss in full. See 2022 WL 837596, at *6. Turning first to
the direct infringement claim, the Court concluded that YouTube
could not be held directly liable for TV-Novosti's "post[ing]
[of] infringing content on the platform" because the plaintiff
"failed to plead adequately that YouTube engaged in volitional
conduct relating to TV-Novosti's alleged infringement." Id. at
*3-4. Any claim that YouTube "volitionally caused" the alleged
infringement was simply implausible, given the plaintiff's own
allegations that: (1) YouTube removed the First, Second, and
Third RT Videos shortly after the plaintiff lodged each of its
DMCA complaints; (2) the allegedly infringing videos remained
blocked at the time of the filing of this action; and (3) TV-
Novosti had edited the allegedly copied content to circumvent
YouTube's "automated processes" designed to detect infringing
media. Id. at *4. The Court also rejected the notion that
YouTube's "failure to terminate" TV-Novosti's channels could
support a direct infringement claim, reasoning in part that this
alleged failure did not "cause[] . . . TV-Novosti's decision to
upload the allegedly infringing content." Id.

Additionally, and "irrespective of whether Business Casual
[could] plead adequately" that YouTube engaged in a volitional
infringing act, the Original Complaint failed to state a direct
infringement claim against YouTube "in view of the License." Id.

9

Business Casual never disputed that its License to YouTube was valid, binding, and enforceable, and under the "clear and broad" terms of that License, YouTube could not "be liable for directly infringing any copyrights associated with content that Business Casual has uploaded to its channel." Id. at *4-5.

Next, the Court found that the plaintiff's contributory infringement claim against YouTube failed for two independent reasons. First, "there [was] no allegation that YouTube knew of TV-Novosti's alleged infringement before Business Casual lodged its DMCA complaints." Id. at *6. Second, in light of Business Casual's allegations that YouTube removed each video shortly after learning of the infringing content, any inference that YouTube "acted in concert" with TV-Novosti or "contributed to the alleged infringement" was implausible. Id.

Finally, the Court determined that Business Casual's claim of vicarious infringement was "similarly without merit." Id. As described in the First Opinion, the plaintiff failed to allege plausibly that YouTube "decline[d] to exercise its right to stop [the] alleged infringement." Id. Further, Business Casual could not hold YouTube vicariously liable for its alleged failure to terminate TV-Novosti's channels, because the Original Complaint made "no allegation that any content currently hosted on any of those channels infringes Business Casual's copyright." Id.

## SPA-11

The Court dismissed all of Business Casual's claims against YouTube without prejudice, stating that "[w]hile it is doubtful that Business Casual can file an amended complaint that is not futile, it should be given an opportunity to do so." Id. In July 2022, Business Casual filed its motion for leave to file the Amended Complaint. See ECF No. 56.

**II.**

Rule 15(a) provides that courts should "freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, such leave need not be granted "[w]here a proposed amendment would be futile." Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." In re Tribune Co. Fraudulent Conv. Litig., 10 F.4th 147, 175 (2d Cir. 2021).

The futility inquiry on a motion for leave to amend is "comparable to that required upon a [Rule 12(b)(6)] motion to dismiss." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 604 (2d Cir. 2005). In evaluating whether granting leave to amend would be futile, a court must consider both the proposed amendments and the original complaint, "accepting as true all non-conclusory factual allegations therein, and drawing all reasonable inferences in the plaintiff's favor." Pyskaty v. Wide

11

SPA-12

World of Cars, LLC, 856 F.3d 216, 225 (2d Cir. 2017); see also
Tribune Co., 10 F.4th at 175.

### III.

The plaintiff has moved for leave to assert amended claims
of direct, contributory, and vicarious copyright infringement
against YouTube. See Am. Compl. ¶¶ 179-208. In response, YouTube
argues that granting leave to amend would be futile because the
plaintiff has not come forward with any new factual allegations
or legal theories sufficient to state a copyright infringement
claim. YouTube also argues that the plaintiff improperly relies
on the DMCA's "safe harbor" provisions, see 17 U.S.C. § 512, as
the basis for a cause of action against YouTube. For the reasons
below, the plaintiff's motion for leave to amend is **denied**.

### A.

To begin, the plaintiff's Amended Complaint fails to cure
either of the defects that required dismissal of the original
direct infringement claims. As discussed in the First Opinion,
to state a claim for direct copyright infringement, a plaintiff
must plausibly allege that the defendant engaged in "volitional
conduct that cause[d]" the infringement at issue. Wolk v. Kodak
Imaging Network, Inc., 840 F. Supp. 2d 724, 741 (S.D.N.Y. 2012)
(citing Cartoon Network LP v. CSC Holdings, Inc., 536 F.3d 121,
131 (2d Cir. 2008)). Where, as here, the defendant is a provider
of an online platform that hosts content uploaded or transmitted

12

by third-party users, the defendant cannot be held liable for the infringing activities of its users unless that defendant played some "deliberate role" in the alleged infringement. Smith v. BarnesandNoble.com, LLC, 143 F. Supp. 3d 115, 123 (S.D.N.Y. 2015); see First Opinion, 2022 WL 837596, at *3 (collecting cases). In other words, a plaintiff pursuing a direct copyright infringement claim against such a platform must establish that the defendant, by virtue of its conduct, "transformed from a passive provider of a space in which infringing activities happened to occur to an active participant in the process of copyright infringement." Smith, 143 F. Supp. 3d at 123.

Here, the Amended Complaint fails to allege any new facts that would support an inference of volitional infringing conduct on YouTube's part. The causes of action in the Amended Complaint arise out of the same three allegedly infringing videos at issue in the Original Complaint, and the plaintiff has not identified any other YouTube-hosted content that might have infringed its copyrights.[3] Moreover, with regard to the three videos underlying

---

[3] The Amended Complaint includes an allegation that the RT Arabic channel on YouTube featured "thousands of other videos that were believed to have infringed the copyrights of Business Casual and many other channels," Am. Compl. ¶ 165, and the plaintiff also refers repeatedly to "TV-Novosti's years of brazen and repeated infringements of plaintiff's copyrights," id. ¶ 113. However, these vague and conclusory allegations lack the specificity required to plead additional instances of copyright infringement, and the Amended Complaint otherwise fails to identify allegedly infringing content beyond the First, Second,

Business Casual's claims, the Amended Complaint alleges that YouTube removed the videos from its platform shortly after receiving the plaintiff's DMCA copyright complaints, see Am. Compl. ¶¶ 82-85, 92, 94-96, 102, that YouTube continued to block access to those videos at least as of the filing of the Amended Complaint, see id. ¶ 103, and that TV-Novosti had altered the allegedly infringed content to circumvent YouTube's automated copyright-detection system, see id. ¶¶ 107-108, 125. As before, these allegations indicate that YouTube policed its platform for copyrighted content and swiftly removed the allegedly infringing videos once they were brought to YouTube's attention, rendering implausible any inference that YouTube volitionally caused the infringement.[4] See First Opinion, 2022 WL 837596, at *4.

---

and Third RT Videos. See Kelly v. L.L. Cool J., 145 F.R.D. 32, 36 (S.D.N.Y. 1992) (a "properly [pleaded] copyright infringement claim must allege," inter alia, "which specific original works are the subject of the copyright claim" and "by what acts during what time the defendant infringed the copyright"), aff'd, 23 F.3d 398 (2d Cir. 1994); Marvullo v. Gruner & Jahr, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000) ("Rule 8(a)(2) has been construed to require a plaintiff to plead with specificity the acts by which a defendant has committed copyright infringement.").

[4] In its motion for leave to amend, Business Casual repeatedly asserts that the Amended Complaint "allege[s] clearly . . . that YouTube provided [TV-Novosti's] channels with access to a secret technology that provides [TV-Novosti] with total immunity from its copyright-detection technology." Pl.'s Memo. of Law, ECF No. 54, at 5. However, contrary to the representations made in the plaintiff's motion, such allegations are completely absent from the Amended Complaint. Perhaps recognizing this discrepancy, the plaintiff submitted with its reply papers a declaration in which Business Casual's founder describes the "secret technology." See Edson Decl., ECF No. 63. But the Court is not entitled to take

## SPA-15

In any event, the plaintiff's Amended Complaint fails to state a claim for direct copyright infringement because it is devoid of allegations casting doubt on the existence, validity, or enforceability of the License. As noted in the First Opinion, "it is a hallmark principle of copyright law that licensors may not sue their licensees for copyright infringement," Jasper v. Sony Music Ent., Inc., 378 F. Supp. 2d 334, 339 (S.D.N.Y. 2005), and here, Business Casual granted to YouTube a broad License to "use," "reproduce, distribute, prepare derivative works [from], display, and perform" the content in Business Casual's YouTube videos, see First Opinion, 2022 WL 837596, at *5. Accordingly, under the plain language of the License, Business Casual cannot hold YouTube directly liable for hosting or displaying video content that Business Casual has uploaded to YouTube's platform. That would include the hosting or displaying of the copyrighted video segments that appeared on TV-Novosti's YouTube channel, because Business Casual had authorized YouTube to display those

judicial notice of that declaration, see Fed. R. Evid. 201(b), and the declaration was not attached to, incorporated by reference into, or integral to the Amended Complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2000) (identifying the limited exceptions to the general rule that courts cannot "consider material outside the complaint" in determining whether the complaint states a claim). Accordingly, the Court cannot consider the declaration and the plaintiff's arguments about its contents.

segments when it uploaded the Rockefeller and J.P. Morgan Videos to YouTube.

In its reply papers on the motion for leave to amend, the plaintiff appears to argue that YouTube cannot "rel[y] on [its] License" because YouTube acted as an "unauthorized licensor" of the Business Casual videos. Pl.'s Reply, ECF No. 62, at 11. The plaintiff specifically contends that YouTube was not entitled to "license [its] works to an infringer," and that YouTube is therefore liable for the infringing activity of "unauthorized licensee" TV-Novosti. Id. But this argument misunderstands the import of the License and the nature of YouTube's license defense. The relevant question here is not whether YouTube was entitled to authorize TV-Novosti's use of Business Casual's copyrighted video content.[5] Rather, the question is whether YouTube's use of the plaintiff's content -- here, the display of copyrighted video segments that Business Casual had previously uploaded to YouTube -- fell within YouTube's broad rights as the licensee of the plaintiff's YouTube videos. As discussed above, the License does cover that use.

---

[5] Indeed, the Amended Complaint does not plausibly allege that YouTube even knew of TV-Novosti's infringing use before it received the plaintiff's DMCA notices, much less that YouTube explicitly or implicitly permitted TV-Novosti to copy Business Casual's videos.

## SPA-17

In short, TV-Novosti's alleged use of Business Casual's copyrighted video segments might support a direct infringement claim against TV-Novosti.[6] See First Opinion, 2022 WL 837596, at *5. But in view of the License, YouTube's display of those video segments cannot supply a basis for a direct infringement claim against YouTube. Because the Amended Complaint fails to cast doubt on the license defense or adequately plead volitional conduct, granting leave to amend with regard to the plaintiff's direct infringement claims would be futile.

### B.

The Amended Complaint likewise fails to cure the various deficiencies that compelled the dismissal of the plaintiff's contributory and vicarious infringement claims. To state a claim for contributory copyright infringement, a plaintiff must allege that the defendant had actual or constructive knowledge of, and substantially participated in, a third party's act of direct

---

[6] Business Casual has indeed pursued a copyright infringement action against TV-Novosti. After TV-Novosti failed to litigate the case for some time, the Court granted Business Casual's order to show cause for a default judgment and referred the case to the Magistrate Judge for an assessment of damages, if any, and entry of a final judgment. See TV-Novosti Action, No. 21-cv-2007, ECF Nos. 69, 70. That matter remains pending. According to the plaintiff's Original Complaint, YouTube has informed the plaintiff that if the TV-Novosti Action is resolved in the plaintiff's favor, the plaintiff may submit a "copy of the judgment" to YouTube so that YouTube can take appropriate action under the Repeat Infringer Policy. See Compl. ¶ 73; id. Ex. S, ECF No. 1-19.

17

infringement. <u>Marvullo v. Gruner & Jahr</u>, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000). It is not enough to allege simply that the defendant provided the direct infringer with the means to engage in infringing activity. <u>Id.</u> Rather, the contributory infringer "must have acted in concert with the direct infringer." <u>Id.</u>

Like the Original Complaint, the Amended Complaint contains no allegation that YouTube knew of the allegedly infringing TV-Novosti videos before Business Casual lodged its DMCA takedown notices. To the contrary, the Amended Complaint alleges that TV-Novosti manipulated the video content for the precise purpose of evading YouTube's detection. Moreover, because YouTube promptly and permanently removed the First, Second, and Third RT Videos from its platform once it received the plaintiff's DMCA notices, the Amended Complaint does not permit an inference that YouTube acted in concert with TV-Novosti.

The Amended Complaint also fails to state a claim for vicarious infringement. To hold a defendant vicariously liable for another party's infringing act, a plaintiff must allege plausibly that the defendant "profit[ed] from [the] direct infringement while declining to exercise a right to stop or limit it." <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 930 (2005). In this case, the plaintiff's allegations foreclose an inference that YouTube declined to exercise its right to stop TV-Novosti's alleged infringement.

18

To the contrary, the allegations indicate that YouTube removed
the First, Second, and Third RT Videos, and thereby stopped the
alleged infringement, shortly after Business Casual notified
YouTube of its copyright concerns.

The Amended Complaint repeatedly emphasizes that the Third
RT Video infringed the same Business Casual images as the First
RT Video, presumably to support an argument that YouTube should
have noticed and removed the Third RT Video sooner. See, e.g.,
Am. Compl. ¶¶ 83, 94, 95, 131. But the alleged similarities
between the infringed images do not support an inference that
YouTube had specific knowledge of the Third RT Video before it
received the plaintiff's DMCA complaint, especially given the
Amended Complaint's allegations that TV-Novosti altered those
images to evade YouTube's copyright-detection process.

Finally, the Amended Complaint takes issue with the fact
that YouTube removed the Second RT Video 23 days after receiving
the plaintiff's second DMCA notice. To the extent the plaintiff
intends to suggest that the length of this 23-day period renders
YouTube secondarily liable for TV-Novosti's infringement, such
an argument is meritless. As before, Business Casual "has not
pointed to any authority" suggesting that YouTube was obligated
to investigate Business Casual's complaint on "a more compressed
timeline." First Opinion, 2022 WL 837596, at *4. Moreover, the
new allegations in the Amended Complaint indicate that YouTube

19

SPA-20

spent the 23-day period actively communicating with Business Casual and evaluating the alleged infringement, see Am. Compl. ¶¶ 118-119, 123-126, foreclosing any inference that YouTube simply sat back and allowed the alleged infringement to occur. Accordingly, the purported delay in YouTube's removal of the Second RT Video does not support a contributory or vicarious infringement claim against YouTube.

In sum, the Amended Complaint fails to remedy the defects that required the dismissal of the plaintiff's original claims for contributory and vicarious infringement. Thus, granting the plaintiff leave to amend with regard to those claims would be futile.

### C.

As with the Original Complaint, the plaintiff devotes much of the Amended Complaint to arguing that YouTube's alleged refusal to terminate TV-Novosti's channels was inconsistent with YouTube's Repeat Infringer Policy, and thus with the "repeat infringer" provision of the DMCA. See 17 U.S.C. § 512(i)(1)(A). Indeed, the bulk of the new allegations in the Amended Complaint concern YouTube's purported failure to apply its Repeat Infringer Policy to TV-Novosti in a reasonable manner. See, e.g., Am. Compl. ¶ 7 (YouTube did not "apply its three-strike policy to all of [TV-Novosti's] associated channels"); id. ¶ 35 ("Plaintiff has brought this case because [YouTube] refuses to

terminate the account of [TV-Novosti] . . . .”); id. ¶¶ 58-62
(identifying alleged flaws in the Repeat Infringer Policy); id.
¶¶ 63-70 (alleging that YouTube maintains an “off-the-books”
“repeat infringer” policy for “special channels”); id. ¶¶ 71-75,
112-113, 129 (alleging that YouTube tolerates the filing of
false counter-notifications); id. ¶¶ 139-155, 156-175
(describing the alleged circumstances of YouTube’s “decision”
not to terminate TV-Novosti’s channels). The plaintiff also
seeks “disgorgement of all [advertising] revenues” that YouTube
“received from the repeat infringer’s thirty-nine channels”
after the allegedly infringing videos were removed, id. at 50,
¶ 4, as well as a declaratory judgment that YouTube, in refusing
to terminate all of TV-Novosti’s channels, failed to “reasonably
implement[]” a “repeat infringer policy . . . as contemplated
by” the DMCA, see id. at 50, ¶ 1 (citing 17 U.S.C. § 512(i)(1)(A)).

Plainly, the plaintiff here is attempting to assert an
independent claim against YouTube for its alleged failure to
discontinue TV-Novosti’s account in accordance with its Repeat
Infringer Policy. Lest there be any doubt on this point, the
plaintiff asserts in its motion papers that YouTube’s failure to
“terminate the accounts of repeat infringers . . . is why we are
here.” Pl.’s Reply at 1. But as this Court already made clear,
Business Casual “misconstrues the safe harbor provisions of the
DMCA and how [those provisions] interact with the other federal

SPA-22

copyright laws." First Opinion, 2022 WL 837596, at *5. The DMCA
does not establish an affirmative cause of action. Rather, the
DMCA provides internet service providers ("ISPs") with potential
"safe harbor" defenses that will shield ISPs from liability for
copyright infringement so long as certain statutory criteria,
including the maintenance of a policy for terminating "repeat
infringers," are met. See Arista Records LLC v. Usenet.com,
Inc., No. 07-cv-8822, 2008 WL 4974823, at *4 (S.D.N.Y. Nov. 24,
2008); Martin v. Tumblr, Inc., No. 15-cv-8338, 2017 WL 11665339,
at *4 (S.D.N.Y. Feb. 10, 2017) (DMCA provision "does not create
a right of action, but rather creates a defense to liability, or
safe harbor"); see also 17 U.S.C. § 512(i)(1)(A) (an ISP will
qualify for the "limitations on liability established by this
section . . . only if the [ISP] . . . has adopted and reasonably
implemented" a "policy that provides for the termination" of
"repeat infringers"). Put differently, an ISP's compliance with
the DMCA's safe harbor provisions does not come into play until
a plaintiff pleads a viable copyright infringement claim against
the ISP in the first instance, at which point, the ISP may
assert its eligibility for a safe harbor as a defense to
liability. See Arista Records, 2008 WL 4974823, at *4 (DMCA's
"limitations of liability apply if the provider is found to be
already liable under existing principles of law").

SPA-23

In short, Business Casual cannot transform the DMCA's prerequisites for a safe harbor defense into the basis for an affirmative claim against YouTube. That is not how the statute was written, and it is not for the Court to permit a cause of action that Congress did not create. The allegations concerning YouTube's failure to terminate TV-Novosti's channels would be relevant here only if the plaintiff had first pleaded a plausible claim for copyright infringement, thereby shifting the burden to YouTube to establish its entitlement to a DMCA safe harbor defense. But the Amended Complaint fails to state an infringement claim against YouTube, and accordingly, whether YouTube has complied with the DMCA's "repeat infringer" provision is immaterial here.[7]

---

[7] For reasons similar to those set forth in the First Opinion, any argument that YouTube is directly or secondarily liable for copyright infringement based on its purported failure to terminate TV-Novosti's channels is meritless. See First Opinion, 2022 WL 837596, at *4, *6. YouTube is alleged to have removed each of the three infringing TV-Novosti videos shortly after receiving Business Casual's DMCA notices, and the Amended Complaint contains no allegation that any videos currently hosted on TV-Novosti's YouTube channels are infringing Business Casual's copyrights. Further, YouTube's claimed refusal to terminate TV-Novosti's channels postdates both TV-Novosti's posting of the three allegedly infringing videos and YouTube's removal of them. Thus, YouTube's alleged failure to terminate TV-Novosti's channels could not have caused or contributed to TV-Novosti's decision to upload the allegedly infringing content at the outset, nor could it constitute volitional conduct that caused or perpetuated the alleged infringement.

SPA-24

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for leave to file the Amended Complaint is **denied,** and the action is **dismissed with prejudice.** The Clerk of Court is respectfully directed to close all pending motions, to enter judgment dismissing this action with prejudice, and to close this case.

SO ORDERED.

Dated:     New York, New York
           November 22, 2022

_____
           John G. Koeltl
    United States District Judge

SPA-25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
BUSINESS CASUAL HOLDINGS, LLC,

                      Plaintiff,

           -against-                           21 **CIVIL** 3610 (JGK)

                                                             **JUDGMENT**
YOUTUBE, LLC, ET AL.,

                    Defendants.

---------------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum Opinion and Order dated November 22, 2022, the Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for leave to file the Amended Complaint is denied, and the action is dismissed with prejudice; accordingly, the case is closed.

**Dated:** New York, New York

        November 23, 2022

                                      **RUBY J. KRAJICK**

                                _____
                                      **Clerk of Court**

             **BY:**           K. Mango

                                    _____
                                      **Deputy Clerk**

(b) REMEDIES.—In a suit described in subsection (a) for a violation described in that subsection, remedies (including remedies both at law and in equity) are available for the violation to the same extent as such remedies are available for such a violation in a suit against any public or private entity other than a State, instrumentality of a State, or officer or employee of a State acting in his or her official capacity. Such remedies include impounding and disposition of infringing articles under section 503, actual damages and profits and statutory damages under section 504, costs and attorney's fees under section 505, and the remedies provided in section 510.

(Added Pub. L. 101–553, § 2(a)(2), Nov. 15, 1990, 104 Stat. 2749; amended Pub. L. 106–44, § 1(g)(6), Aug. 5, 1999, 113 Stat. 222; Pub. L. 107–273, div. C, title III, § 13210(4)(C), Nov. 2, 2002, 116 Stat. 1909.)

AMENDMENTS

2002—Subsec. (a). Pub. L. 107–273 substituted "122" for "121".

1999—Subsec. (a). Pub. L. 106–44 substituted "121" for "119".

EFFECTIVE DATE

Section effective with respect to violations that occur on or after Nov. 15, 1990, see section 3 of Pub. L. 101–553, set out as an Effective Date of 1990 Amendment note under section 501 of this title.

## § 512. Limitations on liability relating to material online

(a) TRANSITORY DIGITAL NETWORK COMMUNICATIONS.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if—

(1) the transmission of the material was initiated by or at the direction of a person other than the service provider;

(2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;

(3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;

(4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and

(5) the material is transmitted through the system or network without modification of its content.

(b) SYSTEM CACHING.—

(1) LIMITATION ON LIABILITY.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider in a case in which—

(A) the material is made available online by a person other than the service provider;

(B) the material is transmitted from the person described in subparagraph (A) through the system or network to a person other than the person described in subparagraph (A) at the direction of that other person; and

(C) the storage is carried out through an automatic technical process for the purpose of making the material available to users of the system or network who, after the material is transmitted as described in subparagraph (B), request access to the material from the person described in subparagraph (A),

if the conditions set forth in paragraph (2) are met.

(2) CONDITIONS.—The conditions referred to in paragraph (1) are that—

(A) the material described in paragraph (1) is transmitted to the subsequent users described in paragraph (1)(C) without modification to its content from the manner in which the material was transmitted from the person described in paragraph (1)(A);

(B) the service provider described in paragraph (1) complies with rules concerning the refreshing, reloading, or other updating of the material when specified by the person making the material available online in accordance with a generally accepted industry standard data communications protocol for the system or network through which that person makes the material available, except that this subparagraph applies only if those rules are not used by the person described in paragraph (1)(A) to prevent or unreasonably impair the intermediate storage to which this subsection applies;

(C) the service provider does not interfere with the ability of technology associated with the material to return to the person described in paragraph (1)(A) the information that would have been available to that person if the material had been obtained by the subsequent users described in paragraph (1)(C) directly from that person, except that this subparagraph applies only if that technology—

(i) does not significantly interfere with the performance of the provider's system or network or with the intermediate storage of the material;

(ii) is consistent with generally accepted industry standard communications protocols; and

(iii) does not extract information from the provider's system or network other than the information that would have been available to the person described in paragraph (1)(A) if the subsequent users had

gained access to the material directly from that person;

(D) if the person described in paragraph (1)(A) has in effect a condition that a person must meet prior to having access to the material, such as a condition based on payment of a fee or provision of a password or other information, the service provider permits access to the stored material in significant part only to users of its system or network that have met those conditions and only in accordance with those conditions; and

(E) if the person described in paragraph (1)(A) makes that material available online without the authorization of the copyright owner of the material, the service provider responds expeditiously to remove, or disable access to, the material that is claimed to be infringing upon notification of claimed infringement as described in subsection (c)(3), except that this subparagraph applies only if—

(i) the material has previously been removed from the originating site or access to it has been disabled, or a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled; and

(ii) the party giving the notification includes in the notification a statement confirming that the material has been removed from the originating site or access to it has been disabled or that a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled.

(c) INFORMATION RESIDING ON SYSTEMS OR NETWORKS AT DIRECTION OF USERS.—

(1) IN GENERAL.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) DESIGNATED AGENT.—The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

(A) the name, address, phone number, and electronic mail address of the agent.

(B) other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

(3) ELEMENTS OF NOTIFICATION.—

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(B)(i) Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

(ii) In a case in which the notification that is provided to the service provider's des-

ignated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

(d) INFORMATION LOCATION TOOLS.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider—

(1)(A) does not have actual knowledge that the material or activity is infringing;

(B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(2) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(3) upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

(e) LIMITATION ON LIABILITY OF NONPROFIT EDUCATIONAL INSTITUTIONS.—(1) When a public or other nonprofit institution of higher education is a service provider, and when a faculty member or graduate student who is an employee of such institution is performing a teaching or research function, for the purposes of subsections (a) and (b) such faculty member or graduate student shall be considered to be a person other than the institution, and for the purposes of subsections (c) and (d) such faculty member's or graduate student's knowledge or awareness of his or her infringing activities shall not be attributed to the institution, if—

(A) such faculty member's or graduate student's infringing activities do not involve the provision of online access to instructional materials that are or were required or recommended, within the preceding 3-year period, for a course taught at the institution by such faculty member or graduate student;

(B) the institution has not, within the preceding 3-year period, received more than two notifications described in subsection (c)(3) of

claimed infringement by such faculty member or graduate student, and such notifications of claimed infringement were not actionable under subsection (f); and

(C) the institution provides to all users of its system or network informational materials that accurately describe, and promote compliance with, the laws of the United States relating to copyright.

(2) For the purposes of this subsection, the limitations on injunctive relief contained in subsections (j)(2) and (j)(3), but not those in (j)(1), shall apply.

(f) MISREPRESENTATIONS.—Any person who knowingly materially misrepresents under this section—

(1) that material or activity is infringing, or

(2) that material or activity was removed or disabled by mistake or misidentification,

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

(g) REPLACEMENT OF REMOVED OR DISABLED MATERIAL AND LIMITATION ON OTHER LIABILITY.—

(1) NO LIABILITY FOR TAKING DOWN GENERALLY.—Subject to paragraph (2), a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

(2) EXCEPTION.—Paragraph (1) shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or to which access is disabled by the service provider, pursuant to a notice provided under subsection (c)(1)(C), unless the service provider—

(A) takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;

(B) upon receipt of a counter notification described in paragraph (3), promptly provides the person who provided the notification under subsection (c)(1)(C) with a copy of the counter notification, and informs that person that it will replace the removed material or cease disabling access to it in 10 business days; and

(C) replaces the removed material and ceases disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in in-

fringing activity relating to the material on the service provider's system or network.

(3) CONTENTS OF COUNTER NOTIFICATION.—To be effective under this subsection, a counter notification must be a written communication provided to the service provider's designated agent that includes substantially the following:

(A) A physical or electronic signature of the subscriber.

(B) Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled.

(C) A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.

(D) The subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification under subsection (c)(1)(C) or an agent of such person.

(4) LIMITATION ON OTHER LIABILITY.—A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

(h) SUBPOENA TO IDENTIFY INFRINGER.—

(1) REQUEST.—A copyright owner or a person authorized to act on the owner's behalf may request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer in accordance with this subsection.

(2) CONTENTS OF REQUEST.—The request may be made by filing with the clerk—

(A) a copy of a notification described in subsection (c)(3)(A);

(B) a proposed subpoena; and

(C) a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

(3) CONTENTS OF SUBPOENA.—The subpoena shall authorize and order the service provider receiving the notification and the subpoena to expeditiously disclose to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged infringer of the material described in the notification to the extent such information is available to the service provider.

(4) BASIS FOR GRANTING SUBPOENA.—If the notification filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declara-

tion is properly executed, the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider.

(5) ACTIONS OF SERVICE PROVIDER RECEIVING SUBPOENA.—Upon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), the service provider shall expeditiously disclose to the copyright owner or person authorized by the copyright owner the information required by the subpoena, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

(6) RULES APPLICABLE TO SUBPOENA.—Unless otherwise provided by this section or by applicable rules of the court, the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum.

(i) CONDITIONS FOR ELIGIBILITY.—

(1) ACCOMMODATION OF TECHNOLOGY.—The limitations on liability established by this section shall apply to a service provider only if the service provider—

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.

(2) DEFINITION.—As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

(j) INJUNCTIONS.—The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies under this section:

(1) SCOPE OF RELIEF.—(A) With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), the court may grant injunctive relief with respect to a service provider only in one or more of the following forms:

(i) An order restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.

(ii) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

(iii) Such other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose.

(B) If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:

(i) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is using the provider's service to engage in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

(ii) An order restraining the service provider from providing access, by taking reasonable steps specified in the order to block access, to a specific, identified, online location outside the United States.

(2) CONSIDERATIONS.—The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider—

(A) whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;

(B) the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;

(C) whether implementation of such an injunction would be technically feasible and effective, and would not interfere with access to noninfringing material at other online locations; and

(D) whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available.

(3) NOTICE AND EX PARTE ORDERS.—Injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided, except for orders ensuring the preservation of evidence or other orders having no material adverse effect on the operation of the service provider's communications network.

(k) DEFINITIONS.—

(1) SERVICE PROVIDER.—(A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

(2) MONETARY RELIEF.—As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.

(*l*) OTHER DEFENSES NOT AFFECTED.—The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.

(m) PROTECTION OF PRIVACY.—Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—

(1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

(2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

(n) CONSTRUCTION.—Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

(Added Pub. L. 105–304, title II, §202(a), Oct. 28, 1998, 112 Stat. 2877; amended Pub. L. 106–44, §1(d), Aug. 5, 1999, 113 Stat. 222; Pub. L. 111–295, §3(a), Dec. 9, 2010, 124 Stat. 3180.)

REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (h)(6), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

CODIFICATION

Another section 512 was renumbered section 513 of this title.

AMENDMENTS

2010—Subsec. (c)(2). Pub. L. 111–295 struck out ", in both electronic and hard copy formats" after "Internet" in concluding provisions.

1999—Subsec. (e). Pub. L. 106–44, §1(d)(1)(A), substituted "Limitation on Liability of Nonprofit Educational Institutions" for "Limitation on liability of nonprofit educational institutions" in heading.

Subsec. (e)(2). Pub. L. 106–44, §1(d)(1)(B), struck out par. heading "Injunctions".

Subsec. (j)(3). Pub. L. 106–44, §1(d)(2), substituted "Notice and ex parte orders" for "Notice and Ex Parte Orders" in heading.

EFFECTIVE DATE

Pub. L. 105–304, title II, §203, Oct. 28, 1998, 112 Stat. 2886, provided that: ''This title [enacting this section and provisions set out as a note under section 101 of this title] and the amendments made by this title shall take effect on the date of the enactment of this Act [Oct. 28, 1998].''

## § 513. Determination of reasonable license fees for individual proprietors

In the case of any performing rights society subject to a consent decree which provides for the determination of reasonable license rates or fees to be charged by the performing rights society, notwithstanding the provisions of that consent decree, an individual proprietor who owns or operates fewer than 7 non-publicly traded establishments in which nondramatic musical works are performed publicly and who claims that any license agreement offered by that performing rights society is unreasonable in its license rate or fee as to that individual proprietor, shall be entitled to determination of a reasonable license rate or fee as follows:

(1) The individual proprietor may commence such proceeding for determination of a reasonable license rate or fee by filing an application in the applicable district court under paragraph (2) that a rate disagreement exists and by serving a copy of the application on the performing rights society. Such proceeding shall commence in the applicable district court within 90 days after the service of such copy, except that such 90-day requirement shall be subject to the administrative requirements of the court.

(2) The proceeding under paragraph (1) shall be held, at the individual proprietor's election, in the judicial district of the district court with jurisdiction over the applicable consent decree or in that place of holding court of a district court that is the seat of the Federal circuit (other than the Court of Appeals for the Federal Circuit) in which the proprietor's establishment is located.

(3) Such proceeding shall be held before the judge of the court with jurisdiction over the consent decree governing the performing rights society. At the discretion of the court, the proceeding shall be held before a special master or magistrate judge appointed by such judge. Should that consent decree provide for the appointment of an advisor or advisors to the court for any purpose, any such advisor shall be the special master so named by the court.

(4) In any such proceeding, the industry rate shall be presumed to have been reasonable at the time it was agreed to or determined by the court. Such presumption shall in no way affect a determination of whether the rate is being correctly applied to the individual proprietor.

(5) Pending the completion of such proceeding, the individual proprietor shall have the right to perform publicly the copyrighted musical compositions in the repertoire of the performing rights society by paying an interim license rate or fee into an interest bearing escrow account with the clerk of the court, subject to retroactive adjustment when a final rate or fee has been determined, in an amount equal to the industry rate, or, in the absence of an industry rate, the amount of the most recent license rate or fee agreed to by the parties.

(6) Any decision rendered in such proceeding by a special master or magistrate judge named under paragraph (3) shall be reviewed by the judge of the court with jurisdiction over the consent decree governing the performing rights society. Such proceeding, including such review, shall be concluded within 6 months after its commencement.

(7) Any such final determination shall be binding only as to the individual proprietor commencing the proceeding, and shall not be applicable to any other proprietor or any other performing rights society, and the performing rights society shall be relieved of any obligation of nondiscrimination among similarly situated music users that may be imposed by the consent decree governing its operations.

(8) An individual proprietor may not bring more than one proceeding provided for in this section for the determination of a reasonable license rate or fee under any license agreement with respect to any one performing rights society.

(9) For purposes of this section, the term ''industry rate'' means the license fee a performing rights society has agreed to with, or which has been determined by the court for, a significant segment of the music user industry to which the individual proprietor belongs.

(Added Pub. L. 105–298, title II, §203(a), Oct. 27, 1998, 112 Stat. 2831, §512; renumbered §513, Pub. L. 106–44, §1(c)(1), Aug. 5, 1999, 113 Stat. 221.)

AMENDMENTS

1999—Pub. L. 106–44 renumbered section 512 of this title as this section.

EFFECTIVE DATE

Section effective 90 days after Oct. 27, 1998, see section 207 of Pub. L. 105–298, set out as an Effective Date of 1998 Amendments note under section 101 of this title.

## CHAPTER 6—IMPORTATION AND EXPORTATION

| Sec. | |
|---|---|
| [601. | Repealed.] |
| 602.[1] | Infringing importation of copies or phonorecords. |
| 603. | Importation prohibitions: Enforcement and disposition of excluded articles. |

AMENDMENTS

2010—Pub. L. 111–295, §4(a), (b)(1)(A), Dec. 9, 2010, 124 Stat. 3180, substituted ''IMPORTATION AND EXPORTATION'' for ''MANUFACTURING REQUIREMENTS, IMPORTATION, AND EXPORTATION'' in chapter heading and struck out item 601 ''Manufacture, importation, and public distribution of certain copies''.

2008—Pub. L. 110–403, title I, §105(a), Oct. 13, 2008, 122 Stat. 4259, substituted ''MANUFACTURING REQUIREMENTS, IMPORTATION, AND EXPORTATION'' for ''MANUFACTURING REQUIREMENTS AND IMPORTATION'' in chapter heading.

---

[1] So in original. Does not conform to section catchline.